IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAWN T. JONES | : | CIVIL ACTION |
| | : | |
| v. | : | No. 10-5544 |
| | : | |
| JEFFERY A. BEARD, et. al. | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                    **August 15, 2011**

Plaintiff Shawn T. Jones, a former inmate in the Berks County Jail System (BCJS), sues former Pennsylvania Department of Corrections Secretary Jeffrey Beard, Berks County Jail Warden George Wagner, and Corrections Officer Cunningham (the Individual Defendants) for violating his constitutional rights. Jones also sues the Individual Defendants and Oasis Management, Inc. for violating the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 331, by selling items marked "Not labeled for individual retail sale" in the BCJS commissary. This Court has reviewed Jones's Amended Complaint pursuant to the Prison Litigation Reform Act (PLRA), 28 U.S.C. § 1915A(b)(1), and will dismiss it with prejudice for failure to state a claim upon which relief may be granted.

**FACTS**[1]

On April 30, 2010, Jones began serving his prison sentence at the Pennsylvania State Correctional Institution (SCI) at Camp Hill. On August 12, 2010, Jones was transferred from SCI Camp Hill to the BCJS. Jones was informed he would remain in the BCJS until February 2011, because of overcrowding at SCI Camp Hill, after which he would return to the custody of the

---

[1] This Court accepts Jones's factual allegations as true for the purpose of deciding whether his Complaint states a claim upon which relief may be granted. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

Pennsylvania Department of Corrections.  Upon his arrival at the BCJS, Jones underwent entry processing during which he was strip-searched, finger-scanned, photographed, and issued a BCJS identification card with a Berks County Prison (BCP) number and a Berks County commitment number.  Jones objected to receiving a BCP identification number, asserting this process improperly identified him as someone who previously committed a crime in Berks County.  Jones filed at least two grievances with the jail addressing this issue and the BCJS responded by explaining that its "records will reflect that you were housed here.  This does not mean you committed a crime in this county."  Am. Compl. 10.  Jones also complained about the finger-scanning process during the BCJS intake, and a BCJS staff member informed Jones he was finger-scanned "for identification purposes."  *Id.*

Jones was also screened by BCJS medical staff upon his arrival.  Jones suffers from asthma and normally keeps a medicated inhaler on his person which he uses twice daily to control his asthma.  Upon Jones's arrival at the jail, the staff confiscated the inhaler and told Jones it would be returned after the medical staff completed his screening.  However, members of the medical staff told Jones he needed approval to keep the inhaler on his person and did not immediately return it.  Later the same day, Jones submitted a sick call slip complaining of shortness of breath and his inhaler was returned to him the following night.  He was thereafter permitted to keep the inhaler with him.  Jones complains that while he was without his inhaler, the Individual Defendants "gambled with [his] life" because he was forced to wait for one of the nurses' three daily rounds to obtain medication or to request a visit to the medical unit to use the nebulizer located there.  Am. Compl. 6.

From August 12, 2010, to August 18, 2010, BCJS housed Jones in quarantine.[2]  While in quarantine, Jones was required to stay in his cell at all times, and was not permitted to use the phone or shower for several days.

On August 21, 2010, Corrections Officer Cunningham entered Jones's cell and asked Jones about some fruit and bread on a desk there.  After Jones identified the food as his, Cunningham explained that BCJS prohibits inmates from having food in their cells unless the items were purchased through the BCJS commissary.  Jones responded that he was unaware of this rule because he was familiar only with the rules of SCI Camp Hill, from which he had been transferred.  This response angered Cunningham, who told Jones that rules he learned at other correctional institutions did not apply at BCJS and while he was at BCJS, he must abide by its rules.  Cunningham then ordered Jones to throw the food away.  Jones obeyed, but was only able to pick up one item at a time due to a hand injury.  This slow pace further angered Cunningham, who began yelling at Jones.  Jones felt frightened and physically threatened by Cunningham's size and presence in his cell and asked the officer to calm down.  After Cunningham told Jones to shut up, Jones asked Cunningham not to speak to him in that tone and manner, and Cunningham threatened to send Jones to isolation for disobeying a direct order to be quiet.  The exchange continued for some time in this manner, ending when Cunningham wrote Jones a citation for misconduct.

Later that evening, Jones was sent to "the hole," or administrative segregation, where he was forced to occupy the top bunk.  Climbing onto the top bunk was a struggle for Jones because of his

---

[2] It is unclear whether Jones's quarantine was due to his medical issues or other concerns, or if a week in quarantine was standard procedure for inmates entering BCJS.

injured hand.[3]  While Jones was in administrative segregation, his mattress was taken from his cell between the hours of 6:00 a.m. and 9:00 p.m pursuant to BCJS policy.  For his meals, Jones was served "food loaf," a specially formulated meal that is nutritionally equivalent to the food served other inmates.  Jones filed a grievance with the jail contesting these conditions, and filed an emergency grievance seeking protection from Cunningham.

After several days of eating food loaf, Jones began to suffer from constipation and headaches. Jones submitted a sick call slip and was examined by a nurse who gave him a laxative.  When Jones used the bathroom, he discovered blood in his stool, so he filed another sick call slip and informed the nurse of his new symptom.  The nurse told Jones he would be taken to the medical unit the following day.  Once there, he was asked to submit a stool sample and was told his symptoms were normal side effects of eating food loaf.

After Jones spent several days in administrative segregation, Lieutenant Castro conducted a hearing on Jones's misconduct charges from the August 21, 2010, incident with Cunningham at which Jones testified.  The next day, Castro dropped the charges of creating a disturbance and abusiveness from the misconduct report.[4]  Jones pled guilty to the remaining charges ( possession of contraband and disobeying an order) and spent ten additional days in administrative segregation as punishment.

On September 12 and 24, 2010, and December 13, 2010, Jones filed grievances with the jail complaining that the BCJS commissary was violating the FDCA by selling items marked "Not

---

[3] On September 2, 2010, less than two weeks later, Jones received a medical order for "bottom bunk status."

[4] Castro told Jones that Cunningham is responsible for the majority of misconduct reports filed against inmates.

4

labeled for individual retail sale." *Id.* at 27.  Jones believes Defendant Oasis Management, Inc. purchased various items at wholesale prices, ignored the labels prohibiting individual retail sale, re-packaged the items, and sold them to prisoners at prices designed to maximize profits.  Jones asserts that Oasis has refused to comply with product distribution laws in distributing products to Jones and other inmates because they are "sentenced imprisoned citizen[s]." *Id.* at 28.  He further complains that he has no option but to purchase these mislabeled items from the commissary because Oasis is the only vendor that deals with the BCJS.  The BCJS dismissed Jones's grievances about the mislabeled items.

According to the Amended Complaint, in October 2010 Jones became eligible for re-classification to a pre-release program, which would have enabled him to serve the remainder of his sentence in a halfway house.  Jones believes he was not able to be re-classified because he was housed at BCJS instead of at a state facility and further objects that he will be housed at BCJS much longer than initially forecast.[5]

On January 14, 2011, Jones filed his Amended Complaint, bringing claims for violations of his constitutional rights pursuant to 42 U.S.C. § 1983, and also alleging violations of the FDCA. Jones asserts Beard and Wagner violated his Fifth and Fourteenth Amendment rights, and violated 42 Pa. C.S. § 9762  by requiring him to serve his state sentence in a county jail.  Jones alleges Defendants violated his Fifth, Fourteenth, and Sixth Amendment rights by strip-searching him, finger-scanning him, and assigning him a BCP number.  Jones asserts the confiscation of his inhaler

---

[5] The Pennsylvania Inmate Locator on the Pennsylvania Department of Corrections website indicates Jones is currently housed at SCI Frackville, though it does not indicate when he was transferred to that facility.  *See* http://inmatelocator.cor.state.pa.us/inmatelocatorweb (search  "Shawn T. Jones") (last accessed Aug. 5, 2011).  Jones was initially told he would be transferred from the BCJS in February 2011.  Am. Compl. 3.

violated his Fifth and Fourteenth Amendment rights, and further asserts his Fifth and Fourteenth Amendment rights were violated by the denial of outdoor exercise time during his six days in quarantine.  Jones also alleges he was denied due process as a result of his incarceration at BCJS because he was unable to be reclassified and was therefore denied the opportunity to participate in pre-release programs involving less restrictive confinement, such as placement in a halfway house. Jones asserts his Eighth Amendment rights were violated through his detention in solitary confinement when he was served "food loaf," deprived of his mattress during the day, and prevented from participating in prison programs, recreation, and other normal activities of prison life, and from using the law library.  Jones's final claim seeks enforcement of product distribution laws which he alleges Oasis has violated through its sale of items marked "Not labeled for individual retail sale" in the BCJS commissary.

**DISCUSSION**

Although the Defendants named in this suit have not yet responded to Jones's Amended Complaint, the PLRA directs district courts to review civil actions in which prisoners seek redress from a governmental entity and to dismiss a prisoner's lawsuit *sua sponte* if it "is frivolous, malicious, or fails to state a claim upon which relief may be granted."  28 U.S.C. § 1915A(b)(1). In determining whether to dismiss a *pro se* prisoner's complaint, a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 233 (citation omitted).  Although courts must "liberally construe" a *pro se* plaintiff's pleading, *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003), a *pro se* complaint will be dismissed if it does not "state a claim to relief that is plausible on its face," *Brown v.*

6

*DiGuglielmo*, No. 09-3494, 2011 WL 944418, at *3 (3d Cir. Mar. 24, 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   If a *pro se* complaint is deficient even when liberally construed, a court may grant a plaintiff leave to amend his claims.  *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

Jones first asserts the Individual Defendants violated his constitutional right to due process by requiring him to serve his state sentence in a county jail.   To succeed on a due process claim, an inmate must show he was deprived of a liberty interest.  *Fraise v. Terhune*, 283 F.3d 506, 522 (3d Cir. 2002).  "[A]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight."  *Id.* (citations omitted).  Jones cannot show his relocation to BCJS deprived him of a constitutionally protected liberty interest, because "prisoners have no constitutional right to be assigned to a particular institution, facility or rehabilitative program."  *Podhorn v. Grondolsky*, 350 F. App'x 618, 620 (3d Cir. 2009) (citing *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983)).

Despite the lack of constitutional protection, a state's policies or statutes may create a liberty interest that is protected under the due process clause.  *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).  Although Jones asserts his transfer from SCI Camp Hill to BCJS violated 42 Pa. C.S. § 9762, that statute does not give Jones a protected liberty interest in his place of confinement. Section 9762 provides, in pertinent part:

> [A]ll persons sentenced to total or partial confinement for the following terms shall be committed as follows:
> (1) Maximum terms of five or more years shall be committed to the Department of Corrections for confinement.
> (2) Maximum terms of two years or more but less than five years may be committed to the Department of Corrections for confinement or may be committed to a county

prison within the jurisdiction of the court.
(3) Maximum terms of less than two years shall be committed to a county prison within the jurisdiction of the court.

42 Pa. C.S. § 9762(a).  Because Jones's maximum sentence is six years and eleven months of imprisonment, pursuant to § 9762(a)(1), he should serve his sentence at a state facility operated by the Department of Corrections.  Although his confinement in a state facility is statutorily mandated, this mandate does not create a protected liberty interest for Jones in his place of confinement. Pursuant to 61 Pa. C.S. § 1151, a Pennsylvania inmate housed in a State correctional institution may be transferred to the jurisdiction of a county correctional institution on either a long-term or temporary basis.  *See* § 1151(a) (authorizing transfers of prisoners between state and county correctional institutions "upon such terms and conditions that the secretary or his designee . . . determine[s] to be in the best interests of the Commonwealth").[6]  Jones therefore has not adequately pleaded a constitutionally protected liberty interest in his place of confinement, and his due process claim challenging his placement in a county jail will be dismissed.

Jones also has failed to state a due process claim insofar as he alleges being housed at the BCJS rendered him ineligible for pre-release programs or re-classification.  Jones contends he was eligible in October 2010 to be re-classified to the pre-release program, under which he would serve the remainder of his sentence at a halfway house.  He therefore alleges his due process rights were

---

[6] Moreover, if any state-created liberty interest existed, which it does not, it would protect the less serious offender's right to remain housed in a county jail.  Section 9762(a) reflects a policy judgment by the Commonwealth that a person sentenced to less than two years of imprisonment should be housed with others who have committed less serious crimes warranting shorter sentences, and should be segregated from those individuals who have committed more serious crimes warranting longer sentences.  *See Commonwealth v. Ward*, 489 A.2d 809, 812 (Pa. Super. Ct. 1985) (explaining that housing an individual sentenced to less than two years of incarceration in a county jail instead of a state penitentiary "recognizes that such a person, who is rarely in trouble, should not be subjected to imprisonment with persons guilty of serious misdemeanors or felonies").

8

violated by virtue of his transfer to BCJS because he was ineligible for reclassification and was "denied progra[ms] and treatments which are a condition to be considered for pre-release or parole." Am. Compl. 6.

Prisoners have a liberty interest in being released on parole if a state's parole-release statute creates an "expectancy of release." *Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1, 12 (1979); *Bd. of Pardons v. Allen*, 482 U.S. 369, 378 (1987) (holding where a state's parole release statute includes mandatory language like "shall," such language "'create[s] a presumption that parole release will be granted' when the designated findings are made"). In Pennsylvania, however, there is no statutory provision for mandatory parole. *See Commonwealth v. Stark*, 698 A.2d 1327, 1333-34 (Pa. Super. Ct. 1997) (holding that, unlike the state statue reviewed in *Greenholtz*, Pennsylvania's parole statute did not create an expectation of parole and therefore creates no liberty interest); *see also Winsett v. McGinnes*, 617 F.2d 996, 1005 (3d Cir. 1980) (noting there is "no constitutionally mandated right to enter a discretionary parole release program"); *Evans v. Pa. Bd. of Prob. & Parole*, 820 A.2d 904, 913 (Pa. Commw. Ct. 2003) ("[P]arole [in Pennsylvania] is nothing more than a possibility, and if granted, it merely constitutes a favor given by the state, as a matter of grace and mercy, to a prisoner who has demonstrated a probability of his or her ability to function as a lab abiding citizen in society.").

Similarly, "Pennsylvania has not created an enforceable liberty interest in parole, rehabilitative pre-release programs, or in therapy programs." *McFadden v. Lehman*, 968 F. Supp. 1001, 1004 (M.D. Pa. 1997) (collecting cases). "[N]o due process protections [are] required upon the discretionary transfer of state prisoners to a substantially less agreeable prison, even where that transfer visit[s] a 'grievous loss' upon the inmate," and "[t]he same is true of prisoner classification

and eligibility for rehabilitative programs." *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (citation omitted). Because Jones had no liberty interest in being classified for pre-release or in receiving the benefit of discretionary rehabilitative programs, he has failed to state a violation of his due process rights by virtue of being housed in the BCJS, and this claim will be dismissed.

Jones further complains that, because he was housed at BCJS instead of a state facility, he was denied the opportunities other inmates serving state sentences received, such as participation in pre-release programs. This Court construes this grievance to allege an equal protection claim under the Fourteenth Amendment, which guarantees to individuals the equal protection of the laws. The right to equal protection of the law is violated if a regulation burdens a fundamental right or targets a suspect class and does not survive strict scrutiny review. *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982). If, however, neither a fundamental right nor a suspect class is implicated, then courts apply a standard of rational basis review to the law or policy in question. *Romer v. Evans*, 517 U.S. 620, 631 (1996). To survive rational basis review, the law or policy must "bear[] a rational relation to some legitimate end." *Id.* In reviewing policies or regulations promulgated by a correctional institution, courts consider whether the regulation "is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89 (explaining that because courts are "ill equipped to deal with the increasingly urgent problems of prison administration," prison authorities' decisions should be accorded deference) (internal quotation marks and citations omitted). If such reasonable relationship exists, the regulation is valid. *Id.*

Jones has not alleged that he has a fundamental right to housing at a state facility.[7] Nor can

---

[7] Indeed, the Fourth Circuit has repeatedly held that inmates do not have such a right. *See Khaliq v. Angelone*, 72 F. App'x 895, 900 (4th Cir. 2003) (no federal right to be housed in a state facility).

he assert that, as a prisoner, he is a member of a suspect class.  *See Abdul-Akbar v. McKelvie*, 239 F.3d 307, 317 (3d Cir. 2001).  Accordingly, the denial of opportunities offered other state inmates will be reviewed under the rational basis standard.  Although Defendants have not responded to Jones's Complaint, excerpts from the BCJS Inmate Handbook which Jones attaches as an exhibit to his Complaint indicate that pre-release classification is "assigned to those who meet a number of criteria."  Am. Compl. 20.   Jones does not allege these criteria are not reasonably related to a legitimate penological interest, therefore his equal protection claim fails.

Jones next alleges Defendants violated his Fifth, Fourteenth, and Sixth Amendment rights by strip-searching him, fingerprinting him, and assigning him a BCP number.  First, Jones has failed to allege a violation of his constitutional rights based on the BCJS admissions process, during which he was strip-searched and finger-printed.  Instead, it appears BCJS officials have instituted a procedure followed upon the arrival of a new inmate.  Understandably, this procedure includes a search of the inmate to ensure safety and measures taken to identify the inmate, such as fingerprinting him and assigning him an identification number in the BCP system.  Jones has not alleged the BCJS intake process was unduly invasive or more intrusive than security demands required, and his claims related to his intake will therefore be dismissed.

Jones also asserts the fact that he has been assigned a BCP number improperly suggests to the public that he has sustained a conviction in Berks County.  He asserts this has injured him because future employers will see his criminal history and infer from his BCP number that he has committed crimes in both Philadelphia and Berks counties.  In its response to one of Jones's grievances about this issue, however, the BCJS explained its records will reflect only that Jones was housed at BCJS.  Jones fails to adequately plead that BCJS's procedure violated his constitutional

11

rights, and this claim must therefore be dismissed.

Jones asserts the confiscation of his inhaler upon his arrival at BCJS violated his Fifth and Fourteenth Amendment rights.  This claim, however, is better construed as an Eighth Amendment claim challenging the BCJS's denial of sufficient medical care for his asthma.  Generally, to state an Eighth Amendment claim, an inmate must allege (1) a "sufficiently serious" deprivation of his rights and (2) the prison official must have a "sufficiently culpable state of mind."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To state a claim for an Eighth Amendment violation based on inadequate medical treatment, an inmate must allege deliberate indifference on the part of prison officials to his serious medical needs.  *Spruill v. Gillis*, 372 F.3d 218, 235-36 (3d Cir. 2004).  A medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation marks and citations omitted).  To qualify as deliberate indifference, an official must actually know of and disregard an excessive risk to an inmate's health.  *Farmer v. Brennan*, 511 U.S. 825, 829 (1994).  "[M]ere disagreement as to the proper medical treatment" and simple malpractice claims do not constitute Eighth Amendment violations.  *Lanzaro*, 834 F.2d at 346.

Jones asserts his Eighth Amendment rights were violated when BCJS medical staff initially refused to let him retain possession of his inhaler, despite knowing he suffered from asthma.  Even assuming Jones's asthma constitutes a serious medical need,[8] *Johnson v. Martinez*, No. 04-1967,

---

[8] While an asthma attack would qualify as a serious medical need, it is not clear that the condition of asthma alone constitutes such a need.  *Compare Lindsey v. Brady*, 537 F. Supp. 2d 666, 671 (D. Del. 2008) (finding that where an inmate did not suffer a severe asthma attack upon termination of breathing treatment, medical need was not serious).  Jones does not allege that he suffered any asthma attacks while at BCJS.

2006 WL 208640, *3 (E.D. Pa. Jan. 16, 2006) (defendant prison officials concede severe asthma is serious medical need), Jones has failed to plead sufficient facts showing BCJS officials were deliberately indifferent to this need.   Jones alleges jail officials held his inhaler for about 24 hours when he first arrived at the BCJS.   During that time, nurses made regular rounds and a nebulizer was located nearby.   Morever, when Jones began complaining of shortness of breath, his inhaler was returned to him and he was permitted to keep it on his person.   While Jones may disagree with the medical treatment provided, these allegations do not support a plausible inference of deliberate indifference, and Jones has therefore failed to state an Eighth Amendment violation.

Jones also asserts the BCJS's denial of outdoor physical exercise during his six days in quarantine violated his constitutional rights.   The denial of exercise or recreation may result in a constitutional violation.  *Peterkin v. Jeffes*, 855 F.2d 1021, 1031 (3d Cir. 1988).   However, a prisoner objecting to the denial of exercise "must demonstrate that such a denial is sufficiently serious to deprive [him] of the minimal civilized measure of life's necessities."  *Gattis v. Phelps*, 344 F. App'x 801, 805 (3d Cir. 2009) (citation omitted).   "[A] temporary denial of outdoor exercise with no medical effects is not a substantial deprivation."  *Id.* (citing *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997)).   Jones has not alleged the six-day denial of his ability to exercise deprived him of the minimal civilized measure of life's necessities or caused him to suffer adverse medical effects, and his claim challenging this six-day deprivation will therefore be denied.

Jones also argues other aspects of his administrative segregation violated his constitutional rights insofar as he was deprived of his mattress during the day, denied access to prison programs, and forced to eat food loaf.   While the Eighth Amendment prohibits prison officials from "depriv[ing] inmates of the minimal civilized measure of life's necessities," *Rhodes v. Chapman*,

13

452 U.S. 337, 347 (1981), the conditions Jones challenges do not rise to the level of an Eighth Amendment violation.   The removal of an inmate's mattress during daytime hours does not deprive the inmate of a basic need because the mattress is available for nine hours at night.  *See Gannaway v. Berks Cnty. Prison*, No. 09-4501, 2011 WL 1196905, at *5 (E.D. Pa. Mar. 31, 2011).  Access to prison programs is also not a constitutional right.  *See Padilla v. Beard*, 206 F. App'x. 123, 125 (3d Cir. 2006); *Allen v. Passaic Cnty. Jail*, No. 09-0408, 2009 WL 4591206, at *10 (E.D. Pa. Dec. 4, 2009).  Jones fails to state a claim based on the removal of his mattress pursuant to BCJS policy because he was not deprived of a basic need nor does he allege any negative medical effects due to the removal.  *See Gannaway*, 2011 WL 1196905, at *6.  He also fails to state a claim due to denial of access to prison programs because he has no constitutional right to such access.

Furthermore, unappetizing food served in prison is not constitutionally actionable. *Maldonado v. McFaden*, No. 94-1477, 1994 U.S. Dist. LEXIS 16837, at *11 (E.D. Pa. Nov. 23, 1994) ("[T]he Eighth Amendment requires only that inmates be provided food that is adequate to maintain health, and served in a sanitary manner.").  Thus, "[a] temporary food loaf diet that fully comports with the nutritional and caloric requirements of [an inmate's] specific dietary needs does not constitute an extreme deprivation denying the minimal civilized measure of life's necessities." *Id.*; *see also Gannaway*, 2011 WL 1196905, at *5 (holding that because the plaintiff never alleged the food loaf "presented an immediate danger to his health or well-being," the defendants did not feed food loaf to the plaintiff with the culpable state of mind necessary for an Eighth Amendment claim); *Hinterlong v. Hill*, No. 05-5514, 2006 U.S. Dist. LEXIS 54952, at *16 (E.D. Pa. Aug. 8, 2006).  Although Jones alleges the food loaf made him feel ill, he was seen by a nurse shortly after complaining about his discomfort and was treated for his symptoms.  When Jones reported more

14

serious side effects, a stool sample was taken and jail medical staff assured Jones it was a normal side effect of eating food loaf.  Defendants granted Jones's requests for medical attention, addressed his symptoms, and were ready to provide further treatment if necessary.  Thus, Jones has not sufficiently stated a claim for violation of his Eighth Amendment rights.

Jones's final claim is that Oasis violated the FDCA by selling items marked "Not labeled for individual retail sale" in the BCJS commissary.  As one district court noted in dismissing a similar claim, "[i]t is entirely unclear what cause of action [an inmate] seeks to raise by [complaining about the sale of items not labeled for individual sale]" because he has no "constitutional right to canteen items labeled for individual sale."  *Palermo v. Coos Cnty. Dep't of Corr.*, No. 08-109, 2008 WL 4200102, at *7 (D.N.H. Sept. 11, 2008).  Furthermore, even if such a constitutional right existed, the FDCA does not permit lawsuits brought by an individual to enforce its regulations.   *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 06-5774, 2009 WL 2043604, at *13 (D.N.J. July 10, 2009).  Accordingly, Jones's claim alleging FDCA violations will also be dismissed.

Because Jones's Amended Complaint fails to state a claim upon which relief may be granted, it will be dismissed in its entirety.  Although when dismissing a pro se civil rights complaint, a district court must typically grant the plaintiff leave to amend, such leave need not be given when "the complaint, as amended, would fail to state a claim upon which relief could be granted."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).  Because further amendment of Jones's complaint would not cure its deficiencies, leave to amend shall not be granted and his Amended Complaint will be dismissed with prejudice.

An appropriate order follows.